UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JODY ADAMS,

                Plaintiff,                      Civil Action No. 11-14558

        v.                            District Judge Gerald E. Rosen
                                    Magistrate Judge Laurie J. Michelson
COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 11]**

Plaintiff Jody Adams ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. (Dkt. 1, Compl.; Dkt. 7, Transcript ("Tr.") 1-4.) This matter is before the Court on cross-motions for summary judgment (Dkt. 10, 11), which were referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 3).

**I. RECOMMENDATION**

For the reasons set forth below, the Court finds that the ALJ's decision is supported by substantial evidence. As such, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the decision of the Commissioner be AFFIRMED.

1

## II.  BACKGROUND

Plaintiff is married and has three children and one grandson.  (Tr. 43.)  Plaintiff worked from 1997 to 2003 as a machine operator.  (Tr. 45.)  She testified that she was "taken out of the shop" on June 19, 2003 by ambulance because of a neck injury.  (Tr. 46.)  Plaintiff testified that she has not worked in any way since 2003.  (*Id*.)  Plaintiff received her GED and attended Davenport University for approximately one year.  (Tr. 44.)

### A.  Procedural History

Plaintiff filed an application for disability insurance benefits and for supplemental security income on September 26, 2003.  (Tr. at 35.)  In both applications, Plaintiff alleged a disability beginning February 2, 2003.  (*Id*.)  These claims were denied by initial determinations dated March 3, 2004 after review by the staff of the Michigan Disability Determination Service ("DDS").  (*Id*.)  Plaintiff then requested an administrative hearing which was conducted on November 20, 2006 before Administrative Law Judge Regina Sobrino.  (*Id*.)  Plaintiff appeared with counsel and testified.  (*Id*.)  Vocational Expert ("VE") Pauline McEachin also testified at the hearing.  (*Id*.)  ALJ Sobrino concluded that the limitations resulting from Plaintiff's severe impairments prevented her from performing her past relevant work, but that there were a substantial number of other jobs Plaintiff could nonetheless perform.  (*Id*.)  Plaintiff requested review of this decision by the Social Security Appeals Council which was denied.  (*Id*.)  No further appeals were sought.

Plaintiff filed the current applications for disability insurance benefits and for supplemental security income on August 22, 2008.  (Tr. at 35.)  In both applications, Plaintiff alleged a disability beginning November 22, 2006, only one day after the issuance of ALJ Sobrino's decision.  (*Id*.)  Both of these claims were denied by initial determination dated

February 5, 2009, after review by Michigan DDS.  (*Id.*)  Thereafter, on April 6, 2009, Plaintiff

filed a written request for a hearing.  (*Id.*)  Plaintiff appeared with counsel and testified at the

administrative hearing held on November 2, 2010 in Flint, Michigan.  (*Id.*)  Judith Findora, a

vocational expert, also appeared and testified at the hearing.  (*Id.*)  With permission from the

ALJ, Plaintiff's counsel submitted additional evidence on November 10, 2010. (*Id.*)  On January

4, 2011, ALJ Peter N. Dowd concluded that Plaintiff had not been under a disability within the

meaning of the Social Security Act from November 22, 2006 through the date of the decision.

(Tr. 28.)   Plaintiff sought review of the ALJ's decision which was denied by the Appeal's

Council on August 12, 2011.  (Tr. 1-4.)  Plaintiff filed a claim with this Court on October 17,

2011. (Dkt. 1.)

     **B.  Medical Evidence**

       1.  Plaintiff's Testimony

Plaintiff testified that she had degenerative disk disease of the spine, fibromyalgia, carpal

tunnel syndrome, obstructive sleep apnea, affective disorder, some type of depression, and a

personality disorder.  (Tr. 50-51.)  Plaintiff acknowledged that she had not had mental health

treatment since June 2009.  (Tr. 51.)  Plaintiff testified that she had been seeing Dr. Awerbuch

for injection therapy, office visits, and pain management. (Tr. 51, 52.)  Plaintiff explained that

she has problems sleeping at night and that her pain would wake her up throughout the night.

(Tr. 54.)  Plaintiff testified that she also has cognitive issues, problems with memory, completing

tasks, concentration, understanding and following instructions.  (*Id.*)  Plaintiff testified that she

had a chore provider that helped her with daily activities.  (Tr. 54-55.)  Further, because the

chore provider is only allowed to do so much each week, Plaintiff's family, friends, and children

would fill in to assist her with daily activities.  (Tr. 55.)  Plaintiff testified that she needs to nap or lie down during the day on a regular basis.  (*Id*.)

When asked if her diagnosed conditions had improved, stayed the same, or worsened since her initial disability hearing, Plaintiff responded:  "Oh, gotten worse."  (Tr. 55.)  Plaintiff further answered,

> Before, like, I could at least go out and cut grass in first or second gear, you know, and then take a break, and then do it some more and take a break, and now all – that's nonexistent.  My 17-year-old, he **--** I haven't been able to weed whack in years. He weed whacks, and then my 81-year-old grandpa drives his tractor over with the truck, on the back of the trailer.  He gets it off and he literally cuts my grass for me.  You know, it's just a lot of little things like that people take for granted.  I don't –
>
> .     .     .
>
> I don't keep pots and pans inside of a stove or around a cupboard.  They got to stay on the cupboard so I don't have to bend over to get them.

(*Id*.)

When questioned if her psychological impairments have gotten better, stayed the same, or gotten worse since her 2006 Social Security denial, Plaintiff responded:

> Gotten worse.  And I'm trying to – it's just it's gotten worse, and I'm trying to function in life, and try to be normal, and put the pain and stuff aside, and don't let the pain override the brain.  But a lot of times, it seems like that's what will occur.

(Tr. 56.)

### 2.   Medical Records

Plaintiff has a history of treatment for migraine headaches, fibromyalgia, carpal tunnel syndrome, cervical and lumbar inflammation, left ulnar neuropathy, sleep apnea with narcolepsy/cataplexy, affective disorder with borderline personality disorder, and chronic pain.

As she testified, Plaintiff saw Dr. Gavin Awerbuch on multiple occasions from 2006 until 2010.  (*See e.g.*, Office Notes, Tr. 338-376, 383-390, 428-463, 506-507, 508-511.)   Dr.

4

Awerbuch's office visits mainly focused on performing cervical and lumbar facet injection therapy and adjusting Plaintiff's pain medications. (*Id*.) Plaintiff, for the main part, reported that the facet injection therapy and/or medications resulted in significant improvements of her pain — sometimes reporting as much as a 50-80% improvement. (Tr. 341, 342, 344, 345, 347, 348, 350, 352, 434, 436, 438, 448.) Other times, but with much less frequency, Plaintiff complained that her treatment regime was not working and needed adjustment. (Tr. 339, 346.)

On December 5, 2006, Dr. Awerbuch noted that Plaintiff came in to begin a series of facet injections, which he further noted had been helpful in the past in reducing her pain and improving her functioning. (Tr. 366.) During the same examination, Dr. Awerbuch noted that Plaintiff was still experiencing "intermittent migraine headaches associated with vomiting." (*Id*.) He placed her on Elavil and Phenergan to help with the migraine symptoms. (*Id*.) Dr. Awerbuch noted constipation problems from Plaintiff's pain medications and placed her on MiraLax. (*Id*.) Otherwise, Plaintiff had no new complaints. (*Id*.)

Plaintiff saw Dr. Awerbuch again on December 19, 2006 where a polysomnogram showed sleep apnea. (Tr. 364.) Dr. Awerbuch encouraged her to try a C-PAP machine. (*Id*.) Plaintiff reported that her use of Elavil helped her sleep, but she requested a lower dose. (*Id*.) Examination of Plaintiff indicated facet syndrome and inflammation. (*Id*.) Dr. Awerbuch indicated that medications helped control Plaintiff's pain and improve function. (*Id*.) Further, he found that Plaintiff's concentration was better since methadone was stopped. (*Id*.) On March 7, 2007, Plaintiff reported improved condition of her migraine headaches. (Tr. 362.) However, Plaintiff reported "significant" problems with neck, shoulder, elbow, and wrist pain, numbness and weakness. (*Id*.) Plaintiff further reported experiencing a few episodes of tinnitus, although she reported that the facet injections helped with reducing this. (*Id*.) Plaintiff also complained of

5

pain and clicking in her right jaw and ear, especially at night when she sleeps. (*Id.*) On this same date, Dr. Awerbuch performed a nerve conduction study on selected motor and sensory nerves of the upper extremities. (Tr. 373.) Dr. Awerbuch concluded that Plaintiff had left ulnar neuropathy at the elbow and bilateral carpal tunnel syndrome. (*Id.*) Dr. Awerbuch also concluded that there was no evidence of cervical radiculopathy. (*Id.*) Plaintiff had diagnostic testing of her cervical and thoracic spines on March 7, 2007. There was levoscoliotic curvature in the upper cervical segments of mild to moderate severity. (Tr. 285.) No underlying bony abnormality was demonstrated. (*Id.*) The thoracic exam was normal. (Tr. 286.)

On May 29, 2007, Plaintiff indicated that she had experienced significant pain relief for about two-and-a-half months and that the treatment allowed her to function, live independently, take care of her children, and enjoy a better quality of life. (Tr. 360.) On June 12, 2007, Plaintiff reported that the injections helped to relieve pain and improve function; she continued to be active – walking and swimming. (Tr. 356.) On July 17, 2007, Plaintiff expressed disappointment that Botox injections were not approved for treatment. (Tr. 355.) Although her previously approved injections had been very helpful in the past, she was hopeful that the Botox injections would help to alleviate her migraine headaches. (*Id.*)

In January 2008, Plaintiff reported that cervical and lumbar facet injections had been very effective in the past at controlling pain and improving function by 50%. (Tr. 352.) Plaintiff continued to report "significant" improvement of her pain in February 2008 with facet injection therapy. (Tr. 349-350.) On February 2, 2008, due to effective treatment, Plaintiff reported that she was "doing more around the house." (Tr. 351.) During a February 19, 2008 office visit, Plaintiff reported improvement in her neck and back following injection treatment, however, she complained of back and fibromyalgia pain as well as ongoing fatigue. (Tr. 349.) Dr. Awerbuch

6

ordered an EMG and an MRI to determine the nature, extent and severity of her pathology. (*Id.*) Plaintiff participated in physical therapy at Standish Rehabilitation Center to aid in the treatment of her neck and back pain on May 28, 2008. (Tr. 291-294.)

On June 10, 2008, a Multiple Sleep Latency Test was performed which indicated that Plaintiff had hypersomnia with an average sleep latency of 8.0 minutes. (Tr. 336.) Dr. Awerbuch determined that Plaintiff had narcolepsy without cataplexy. (*Id.*) Further, it was determined that Plaintiff had sleep apnea with sleep disruptions and was advised to use a BiPAP at home for improving nocturnal sleep and daytime alertness. (Tr. 337.)

On October 7, 2008, Plaintiff saw Dr. Awerbuch for treatment of migraine headaches. (Tr. 389.) She reported that she had been to the emergency room, but that generally her migraines have been controlled. (*Id.*) On October 21, 2008, Plaintiff met with Dr. Awerbuch and indicated that she was going to meet with her family doctor to review her medications and come up with a treatment plan. (Tr. 385.) An MRI of Plaintiff's brain was performed at Bay Regional Medical Center on October 28, 2008 which was unremarkable. (Tr. 384.)

On August 5, 2010, Dr. Awerbuch provided a medical source statement (physical) indicating Plaintiff's current limitations, including that Plaintiff could lift less than 10 pounds occasionally, less than 10 pounds frequently, stand or walk for about 2 hours in an 8 hour workday, sit less than 6 hours in an 8 hour workday, and must alternate between sitting and standing. (Tr. 507.) Moreover, Dr. Awerbuch, noted that Plaintiff had moderate limitations in her upper (right-left) and lower (left) extremities. (*Id.*) Dr. Awerbuch further indicated that Plaintiff's work-related limitations included: no power tools, keyboards, climbing, stooping, or kneeling. (*Id.*) He reported that the above limitations had existed "since 2003." (*Id.*)

For a portion of this time, Plaintiff also participated in mental health services at M.P.A. Group., however, treatment notes there indicate that her case file was closed on June 15, 2007 due to lack of contact/attendance.  (Tr. 303, 315.)   Plaintiff later continued mental health counseling services through M.P.A., but her periodic reviews indicated that she continued to experience difficulty keeping appointments and following through with counseling objectives. (Tr. 324, 325.)   On her 2009 Annual Update, Dr. Tadeo indicated that Plaintiff's primary diagnosis was borderline personality disorder.  (Tr. 470.) Plaintiff was discharged in February 2010 because she had not been consistent in attending appointments with her case manager or with her psychiatrist.  (*Id*.)

A Mental Residual Functional Capacity (RFC) Assessment (Tr. 402-05) was prepared by Mark Garner, Ph.D., on February 4, 2009.  He concluded: "Claimant would have difficulty completing detailed tasks on a sustained basis.  Claimant would do best in solitary tasks that do not require frequent interactions with the general public.  Claimant retains the ability to do one and two step tasks on a sustained basis.  ALJ 11/21/2006 decision in regard to [mental impairment] is adopted." (Tr. 404.)

Dr. Daniel Dolanski, D.O., prepared a Physical Residual Functional Capacity (RFC) Assessment on February 4, 2009.  (Tr. 406-413.) He concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand at least 2 hours in an 8 hour work day, and sit about 6 hours in an 8 hour work day, with a sit/stand option.  (Tr. 407.)  With respect to postural limitations, Dr. Dolanski recommended no balancing.  (Tr. 408.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status), and Supplemental

8

Security Income (for poverty stricken adults and children who become disabled)"are available only for those who have a 'disability.'"  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.  The Administrative Law Judge's Findings**

The ALJ first determined that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2009.  (Tr. 18.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 22, 2006, the currently alleged onset date.  (Tr. 18.)

At step two, the ALJ determined that Plaintiff had the following severe impairments:  (1) degenerative disc disease of the lumbar and cervical spines; (2) fibromyalgia; (3) carpal tunnel syndrome (CTS) with left ulnar neuropathy; (4) obstructive sleep apnea with narcolepsy/cataplexy; (5) affective disorder with borderline personality disorder; and (6) chronic pain syndrome.  (Tr. 18.)

At step three, the ALJ determined that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 18.)

Between steps three and four, the ALJ determined that Plaintiff had the physical residual functional capacity (RFC) to perform light and sedentary work as defined in 20 CFR 404.1567(a), 404.1567(b),416.967(a) and 416.967(b) except as restricted by the following:

> [T]he claimant is able to lift/carry and push/pull weights of 20 pounds occasionally and a maximum of 10 pounds frequently: the claimant can stand/walk for 4 hours in an 8 hour work day and sit for up to 8 hours in an 8 hour work day, but would require the ability to alternate between sitting and standing at will: the claimant should not be required to kneel, crouch, crawl or climb ladders, ramps or scaffolding: the claimant may only occasionally climb stairs or balance, and only rarely stoop: she should avoid overhead reaching, exposure to hazards, vibrations, operation of foot or leg controls and driving as a work duty; the claimant should not be exposed to extremes of temperature or humidity; the claimant should not twist her back more than occasionally; the claimant is limited to frequent, but not constant, handling, fingering and feeling; and the claimant is mentally limited to

10

> simple, routine and repetitive work activities that involve no more
> than superficial contact with coworkers and supervisors; the
> claimant should not perform work that involves confrontation,
> negotiation or dealing with the general public.

(Tr. 22-23.)

At step four, the ALJ concluded that Plaintiff was unable to perform any past relevant work. (Tr. 26.)

At step five, the ALJ concluded that given Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the regional economy that Plaintiff could perform.  (Tr. 25.)   The ALJ, therefore, concluded that Plaintiff was not under a disability, as defined by the Social Security Act, from the alleged onset date through the date of the disability decision, January 4, 2011.  (Tr. 28.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);  *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

## F. Analysis

Plaintiff raises three claims of error: (1) the ALJ improperly rejected the opinion of her treating source physician in favor of a one-time DDS evaluator (Pl.'s Mot. Summ. J., at 12-14.); (2) the ALJ improperly discounted Plaintiff's credibility regarding her subjective complaints of pain (Pl.'s Mot. Summ. J., at 9-12); and (3) the ALJ did not offer a proper hypothetical to the vocational expert that accurately depicted her impairments. (Pl.'s Mot. Summ. J., at 8-9, 14-15.)

> 1. *The ALJ's decision that Plaintiff's physical and mental health had not changed since the 2006 RFC was supported by substantial evidence.*

Plaintiff's first claim of error is that the ALJ improperly credited the DDS assessments of Dr. Dolanski & Dr. Garner, one-time evaluators, over the medical records of her primary source physician, Dr. Awerbuch, with whom she had established a long-term care relationship.  (Pl.'s Mot. Summ. J., at 12-14.)

In her motion, Plaintiff claims that:

> On August 5, 2008, Dr. Awerbuch reported the diagnoses of neck and shoulder pain with cervical facet inflammation, subluxation and radiculopathy; bilateral shoulder derangements; carpal tunnel syndrome; and low back pain.  These diagnoses continued throughout his records.  Ms. Adams received injections which helped relieve some of the pain however her activities did not increase and when she needed to rest she was able to do so.

(Pl.'s Mot. Summ. J. at 14.)

Plaintiff's argument, however, fails to take into account that an ALJ adjudicating a subsequent claim for benefits must adopt the RFC finding from the earlier claim unless there is new and material evidence relating to the RFC determination.   AR 98-4(6), 1998 SSR LEXIS 5; *Drummond v Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997); *Wilson v. Comm'r of Soc. Sec.*, No. 08-11925, 2009 U.S. Dist. LEXIS 91091, at *19 (June 4, 2009).  ALJ Dowd, therefore, was only able to consider new and material evidence relating to the RFC determination that Plaintiff submitted since her November 21, 2006 denial.  (*See* Tr. 23-24.)

In her November 21, 2006 denial, ALJ Sobrino determined Plaintiff's RFC as being able to:

> lift, carry, push and pull a maximum of 10 pounds frequently and 20 pounds occasionally. She can stand/walk 4 hours in an 8-hour work day and sit up to 8 hours in an 8-hour work day, provided she is able to alternate sitting and standing at will. She should not kneel, crouch, crawl, or climb ladders, ramps, or scaffolds. She can occasionally climb stairs and rarely stoop. She should avoid overhead reaching, exposure to hazards, vibration, operation of foot or leg controls, and driving as a work duty. She should not be exposed to extremes of temperature or humidity. She should not need to twist her back more than occasionally. She can frequently (but not constantly) handle, finger and feel. She is limited to performing simple, routine, repetitive work that involves no more

13

> than superficial contact with co-workers and supervisors. She
> should not perform work that involves, confrontation, negotiation,
> or dealing with the general public.

(Tr. 76.)

ALJ Dowd determined that the medical evidence Plaintiff presented since her November 2006 denial did not result in a finding that Plaintiff's capacity for work-related activity had significantly changed since ALJ Sobrino's decision. (Tr. 24.)  With respect to Plaintiff's physical impairments, ALJ Dowd concluded:

> [T]he treatment records of Dr. Awerbuch appear to indicate that the
> claimant's physical condition has remained relatively stable since
> 2006 with treatment.  While she continues to complain of extreme and
> intractable pain in her submissions to the record, Dr. Awerbuch's
> records clearly indicate that the claimant reported substantial pain
> relief (of back, leg, arm and other pain) with narcotic pain medication
> and repeated facet injection therapy (again, she reported relatively
> long-lasting improvement in pain levels of 50% just with injection
> therapy and denied significant side effects even from methadone use).
> Few clinical deficits relating to these impairments were noted
> consistently in Dr. Awerbuch's records, and no obvious explanation
> for her intractable and allegedly refractive chronic low back or neck
> pain is presented (again, no more than mild to moderate spinal
> abnormalities have been confirmed by imaging, with no indication
> whatsoever of severe nerve root or spinal cord compromise).  She did
> not allege experiencing serious migraine pain with any consistency
> despite her allegations at [the] hearing[,] in function reports:
> significant complaints occurred in June 2007 and October-November
> 2008, with no other ER visits or consistent complaints of serious
> headache pain. The claimant's use of long-standing narcotic therapy,
> in short, appears from the clinical record to offer her far more relief
> than she alleges elsewhere.

(Tr. 24.)

While Dr. Awerbuch provided a medical source statement (Tr. 507) that post-dates the prior denial, ALJ Dowd concluded, and this Court agrees, that the statement provides "little utility."  (Tr. 25, 507.)  Explaining the reasons for only affording minimal weight to the evidence, ALJ Dowd stated:

> In a statement dating from September 2010 (Ex. B16F), Dr.
> Awerbuch indicates that the claimant would be incapable of even the

14

minimal requirements of sedentary work: unable to lift/carry even 10 pounds, stand/walk for even 2 hours or sit for even 6 hours.  He also included "moderate" restrictions regarding use of the upper extremities and left lower extremity and some postural restrictions. He concluded that the claimant would be incapable of a full-time work schedule.  Dr. Awerbuch's inclusion of at least "moderate" limitations with regard to manipulative activities and use of the lower extremities is not obviously overstated, although the undersigned notes that the claimant remains capable of extensive handwriting sessions, painting ceramics, driving and other activities.  However, given that Dr. Awerbuch's clinical records appear to indicate that the claimant experienced significant improvement in her pain symptoms with treatment, his relatively serious exertional limitations appear to be overstated.  The undersigned also notes that, recently, there are considerable gaps in treatment offered by Dr. Awerbuch to the claimant (with the latest gap apparently extending more than a year). Dr. Awerbuch's limitations, in short, appear to be a reflection of the claimant's subjective allegations regarding her limitations: he relied in general on the claimant's reported symptoms in his diagnoses and treatment modes (again, few clinical or diagnostic studies supported the claimant's reports of extreme chronic pain).  All in all, the undersigned has given little weight to Dr. Awerbuch's opinion here, as it appears inconsistent in general with the evidence of record.

(Tr. 25.)

Further, DDS medical consultant, Dr. Dolanski, provided a Physical RFC assessment that ALJ Dowd deemed to be more consistent with the clinical and diagnostic medical evidence of record.  (Tr. 25, 406-13.)  The only two differences in Dr. Dolanski's RFC and the 2006 RFC were: 1) a new diagnosis of narcolepsy/cataplexy, and 2) a postural "balancing" limitation.  (Tr. 25, 408.) Given these changes, Dr. Dolanski opined that the claimant would likely be unable to stand/walk for more than 2 hours in an 8 hour work day (versus ALJ Sobrino's RFC which indicated that the claimant would be capable of standing/walking 4 of 8 hours with a sit-stand option).  (Tr. 407.)

Contrary to Plaintiff's suggestion that ALJ Dowd gave Dr. Dolanski much more credence, the ALJ gave only partial weight to Dr. Dolanski's opinion, concluding:

As previously noted, the claimant's narcolepsy/cataplexy appears to have been well controlled after June 2008: there is no indication in the record that the claimant made complaints of narcolepsy/cataplexy specifically or any indication that her alleged levels of fatigue substantially fluctuated over the period under consideration.  In short,

15

a longer view of the record (Dr. Dolanski completed his assessment in February 2009) provides no basis for a finding that the claimant's narcolepsy/cataplexy would have resulted in more significant problems with walking/standing than the claimant experienced at the time of Judge Sobrino's decision (especially considering that she has been extended an at-will sit/stand option in the above RFC). Otherwise, as noted, Dr. Dolanski's decision is essentially compatible with Judge Sobrino's prior RFC and consistent in general with the clinical and other evidence of record. It has been given partial weight here.

(Tr. 25.)

In addition, ALJ Dowd concluded that nothing in the current record indicated that "claimant's mental condition and mental capabilities have significantly deteriorated since Judge Sobrino rendered her findings." (Tr. 24.) This finding comported with Dr. Garner's conclusions who likewise adopted ALJ Sobrino's November 21, 2006 decision. (Tr. 404.) Plaintiff does not seem to contest this point in her motion and has not directed the Court to any record evidence showing a change in her mental condition different from the 2006 denial of benefits.

Substantial evidence supports ALJ Dowd's conclusion that the record indicated that Plaintiff's physical and mental condition "remained relatively unchanged" since ALJ Sobrino's RFC determination in 2006. (Tr. 25.) "Under SSAR98-4(6) and *Drummond*, [he was] therefore obliged to conform to Judge Sobrino's prior RFC assessment for the current period under consideration." (Tr. 26.) Judge Dowd explained Plaintiff's limitations as follows:

She has been limited to a restricted range of light to sedentary exertional work (primarily sedentary in nature) with a sit/stand option employable at will. Her postural activities have been very seriously restricted, with an essential inability to perform postural activities other than climbing stairs (occasionally), balancing (occasionally), twisting of the back (occasionally) and stooping (only rarely) (the undersigned's inclusion of a restriction regarding "balancing" is the sole difference between the above RFC and Judge Sobrino's prior RFC and is based on Dr. Dolanski's assessment). Overhead reaching, exposure to hazards, exposure to vibration, exposure to extremes of temperature, operation of foot or leg controls and commercial driving have been precluded (due primarily to symptoms of generalized pain, leg pain and upper extremity pain associated with lumbar disc disease, fibromyalgia and CTS/ulnar neuropathy). Due almost

16

> exclusively to the confirmed presence of bilateral CTS and left ulnar neuropathy, the claimant may engage in manipulative activities (handling, fingering and feeling) only frequently (but not constantly). From a mental standpoint, she has been restricted to simple, routine and repetitive work with substantial limitations on social interaction (superficial contact with coworkers and supervisors, no contact with the public and no confrontation or negotiation). These mental limitations appear appropriate under the circumstances. Indeed, there is no evidence relating to the current period under consideration, which suggests additional or more restrictive limitations than those included by Judge Sobrino would be warranted in this case.

(Tr. 26.)

While Plaintiff would have this Court apply the treating-source rule with respect to Dr. Awerbuch , the Court (as was the ALJ) is bound by the rules of *res judicata*. *Drummond,* 126 F.3d at 842; *Wilson,* 2009 U.S. Dist. LEXIS, at *19. Indeed, Plaintiff has not directed the Court to any specific evidence that the ALJ overlooked — nor has this Court's independent review uncovered any evidence — which demonstrates that she has experienced a change of circumstances sufficient to disrupt ALJ Sobrino's earlier RFC decision beyond the slight modification that ALJ Dowd found appropriate. In *Cole v. Comm'r of Soc. Sec.,* No. 11-11936, 2012 U.S. Dist. LEXIS 132385, at *32-33 (E.D. Mich. Aug. 30, 2012), the Commissioner overcame an identical treating-source argument when this Court held that an ALJ provided sufficiently good reasons for not adopting a treating physician's opinions to the extent they were not consistent with the DDS findings and the medical evidence of record since the first ALJ decision was issued. *Id.* This Court finds it notable that in *Cole*, the treating physician was also Dr. Awerbuch. Moreover, in *Cole*, as in this case, the Court credited Dr. Awerbuch's opinion to the extent it was consistent with the DDS findings and the medical evidence in the record since the first ALJ decision. *Id.* at *32.

For all of these reasons, substantial evidence supports the ALJ's RFC as an accurate portrayal of Plaintiff's capacity for work-related activities.

  2. *The ALJ's credibility determination is supported by substantial evidence.*

Next, Plaintiff claims that the ALJ erred as a matter of law in assessing Plaintiff's credibility regarding her subjective complaints of pain. (Pl.'s Mot. Summ. J., at 9-12.) In evaluating a claimant's pain, the credibility of the claimant is an issue properly before the ALJ. *Kirk v. Sec. of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). Moreover, because the ALJ is charged with the duty of observing the claimant's demeanor and credibility, great weight and deference should be accorded to the ALJ's credibility determination. *Villarreal v. Sec. of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). An ALJ's credibility determination, however, must be supported by substantial evidence. *Beavers v. Sec. of Health, Educ. & Welfare*, 577 F.2d 383, 386-87 (6th Cir. 1978). The Court concludes that substantial evidence exists in the record to support the ALJ's credibility finding here.

When determining questions of credibility, "[f]irst, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p, 1996 WL 374186 at *2. If the ALJ finds that an impairment exists, the ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* Next, if the "individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.* The regulations provide a non-exhaustive list of considerations — in addition to the objective medical evidence, *see* 20

C.F.R. § 404.1529(c)(4) — that inform this credibility assessment: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

While 20 C.F.R. § 404.1529 "contains no express articulation requirement," SSR 96-7p does. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732 (N.D. Ohio 2005). That ruling provides, in pertinent part,

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p.

However, even in view of SSR 96-7p's explanatory requirement, courts have found that an ALJ's narrative need not explicitly discuss each of the seven factors identified in 20 C.F.R. § 404.1529(c)(3); rather an ALJ's decision "should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence." *Cross*, 373 F. Supp. 2d at 733 (citing *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1054 (E.D. Wis. 2005)); *see also Bowman v. Chater*, 132 F.3d 32 (table), 1997 WL 764419, at *4 (6th Cir. 1997) ("While this court applied

each of [the 1529(c)(3) factors in [*Felisky v. Bowen*, 35 F.3d 1027, 1039-1040 (6th Cir. 1994)] we did not mandate that the ALJ undergo such an extensive analysis in every decision.  Rather, we held that where the medical record does not contain objective evidence to support pain allegations, such allegations may not be dismissed without a review of non-medical factors."); *Rife v. Comm'r of Soc. Sec.*, No. 10-11175, 2011 WL 689655, at *2 (E.D. Mich. Feb. 16, 2011) ("[A]n ALJ's credibility determination need only be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'") (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 238 (6th Cir. 2007)).

Here, the record contains very little, if any, objective physical or clinical evidence that would confirm pain of disabling severity.  Indeed, Plaintiff's motion did not direct the Court to any specific evidence in the record that the ALJ overlooked in this regard.  Moreover, the Court's independent review of the record did not uncover any objective medical evidence that thet ALJ did not account for when he considered Plaintiff's subjective complaints of pain.

This Circuit has held that an ALJ can properly discount a claimant's credibility where there are contradictions among the medical reports, claimant's testimony and other evidence. *See, e.g., Bradley v. Sec. of Health & Hum. Servs.*, 862 F.3d 1124, 1127 (6th Cir. 1988); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  An ALJ may also take into account household and social activities engaged in by the claimant in evaluating assertions of pain or ailments.  *Walters*, 127 F.3d at 532.

Here, the ALJ pointed to several contradictions in the record as reasons why he discounted Plaintiff's credibility:

She reportedly performs no significant chores, rarely cooks, and performs few other activities despite her apparent role as chief caregiver for three children[;]

With regard to social functioning, the claimant also alleges significant difficulties.  She reported an increase in levels of frustration and irritability (again, primarily due to pain) and reported that she spends much less time socializing with friends or attending social events in public.  Nonetheless, she appears capable of going into public (to shop, perform errands or attend treatment sessions) as needed.  There is no indication in the record that the claimant experienced significant difficulties interacting appropriately with any treating or examining sources, and there were no indications of significant interpersonal deficits at hearing[;]

With regard to maintaining concentration, persistence and pace, the claimant alleges very serious deficits, again primarily due to chronic pain and fatigue.  She alleges significant problems with memory and focus due to her symptoms.  In her 2008 function report (Ex. B4E), in response to the question "For how long can you pay attention," the claimant wrote: "What? I had to reread. I forgot above question."  This is a curious response, especially in light of the fact that none of her other responses in any way suggested problems with focus.  Indeed, the claimant submitted function report and daily activity report (Ex. B12E) provide answers to questions that are pertinent, detailed and unusually copious.  These facts do not suggest that the claimant is an individual who lacks significant attention or focus.  The medical record, moreover, includes few indications of deficits in attention, focus or memory: Dr. Awerbuch"s records make no such observations, and the few mental status examinations the claimant attended appear to note that her cognitive abilities are at least "fair."  Under the circumstances, the claimant's deficits in this area are no more than moderate in degree[;]

(Tr. 21-22.)  As discussed at length above, the Court finds that the ALJ conducted a careful review of the physical and mental medical records in this case and determined that Plaintiff's condition remained relatively stable since 2006 with treatment.  It is clear to the Court that the ALJ, while not specifically referencing by name or number, considered the factors described in 20 C.F.R. § 404.1529(c).  While Plaintiff alleges that she was in extreme and intractable pain, the medical records detailed above and even those of her treating source physician – Dr. Awerbuch –

21

indicate that the claimant reported substantial pain relief (of back, leg, arm and other pain) with narcotic pain medication and repeated facet injection therapy.  (Tr. 24.)  Moreover, the record establishes that Plaintiff was able to remain active and engage in social activities inconsistent with someone in extreme and intractable pain, such as household chores, swimming, and walking.  (Tr. 351, 356.)  Given these inconsistencies, the ALJ reasonably concluded:

> Indeed, the claimant's allegations in general appear to be inconsistent with the evidence of record and not wholly credible. There is an obvious disconnect between her allegations and the medical evidence which appears to confirm that the claimant experienced significant pain relief with regular treatment.  Despite her alleged inability to perform chores or any sort or to cook with any regularity, the claimant appears to have remained capable of some driving, shopping and hobbies such as painting ceramics (though she reported using a larger brush currently).  Certain responses to questions in the function reports appear to be inconsistent or even contrived: her response to the question "For how long can you pay attention?" is the most glaring example (Ex. B4E).   Such obvious exaggeration in her allegations makes it difficult to gauge the true extent of the claimant"s work related deficits.  The undersigned is satisfied that her allegations in general are overstated, and that her limitations would not require her to lie down or rest for excessive periods of time in a given day.

(Tr. 24-25.)  The Court finds that ALJ acted properly when he took these factors into account and that substantial evidence supports the ALJ's credibility determination.

### 3.   The ALJ presented an accurate hypothetical to the Vocational Expert (VE).

Finally, Plaintiff claims that the ALJ gave the vocational expert an improper hypothetical by failing to account for Plaintiff's subjective complaints of pain in all significant respects. (Pl.'s Mot. Summ. J., at 8-9, 14-15.)  Plaintiff specifically complains that the ALJ did not take into account hypothetical questions that Plaintiff's attorney asked at the hearing that went to Plaintiff's alleged ability to perform specific work-related tasks.  (Pl.'s Mot. Summ. J., at 8-9.)

The Sixth Circuit states that "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays [the] plaintiff's individual physical and mental impairments." *Varley v. Sec'y of Health & Human Servs*, 820 F.2d 777, 779 (6th Cir. 1987) (internal citations omitted); *Webb v. Comm'r of Soc. Sec.,* 368 F.3d 629, 632 (6th Cir. 2004). That said, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Sec'y of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir. 1987).

As discussed above, substantial evidence supports the ALJ's RFC and credibility determinations, therefore, the hypothetical to the vocational expert was proper.

### G.  Conclusion

For the foregoing reasons, this Court finds that the ALJ's conclusions are supported by binding precedent and substantial evidence.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections aparty may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474

F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  A copy of any objections is to be served upon this magistrate judge.  E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.   E.D. Mich. LR 72.1(d)(3), (4).


                                        S/Laurie J. Michelson
                                        Laurie J. Michelson
                                        United States Magistrate Judge


Dated: November 6, 2012


                            **PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon the parties and/or counsel of record  via the Court's ECF System and/or U. S. Mail on November 6, 2012.

                                        s/Jane Johnson
                                        Case Manager to
                                        Magistrate Judge Laurie J. Michelson